# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BSD-360, LLC** | : | |
| **d/b/a THE GODDARD SCHOOL,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| **v.** | : | |
| | : | |
| **PHILADELPHIA INDEMNITY** | : | |
| **INSURANCE COMPANY,** *et al.*, | : | **No. 20-4719** |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                           JANUARY _13_, 2022

 An insurance contract is an agreement between the customer, the insured, and the insurance company, the insurer. Goddard School purchased insurance to protect itself from property damage and other types of loss. In early 2020, like many businesses around the country, Goddard was forced to suspend operations due to the COVID-19 global pandemic. Goddard sought to recover under its insurance policy. When its claim was denied, Goddard sued both the insurance company and its insurance broker. But even though Goddard's insurance policy contains a provision related to communicable diseases, its claim is not covered under the plain language of its contract. Because Goddard has not stated a claim for relief under its insurance policy, the Court grants the insurer's motion to dismiss the complaint. And because Goddard has not alleged any negligence on the part of its broker, the Court also grants the broker's motion to dismiss.

## BACKGROUND

 The Goddard School is a daycare and preschool located in Wall Township, New Jersey. Goddard, through its insurance broker, Specht Insurance Group, Ltd. ("Specht"), purchased an "all-risk" insurance policy issued by Philadelphia Indemnity Insurance Company ("PIIC").

Goddard alleges that it was contacted "[o]n or about March 18, 2020. . . by a student's parent who was present at the covered premises, in the presence of students, faculty and other parents, as recently as March 16, 2020. The parent advised that she tested positive for Covid-19." Doc. No. 8, Am. Compl. ¶ 9. Goddard alleges that it attempted to alert the New Jersey Department of Health but was never able to get through. Despite that, Goddard was forced to close shortly thereafter when New Jersey Governor Murphy issued executive orders on March 21 and March 25, 2020. Goddard alleges that it was forced to close "as a result of the contamination at the covered property and the order of civil authority." *Id.* ¶ 12.

Goddard made a claim under its policy with PIIC for business income and extra expenses coverages in order to "recoup substantial, ongoing financial losses directly attributed to the contamination and the civil authority closure orders." *Id.* ¶ 14. To Goddard's dismay, PIIC responded that it would only reimburse Goddard for the costs of cleaning and decontaminating the premises but would not pay for Goddard's claimed business income loss and extra expenses. Thus, Goddard sued seeking declaratory judgment that its policy covers Goddard's losses and seeking damages for its breach of contract and bad faith claims. Goddard also seeks damages against its broker, Specht, for negligence in procuring the policy and negligently misrepresenting information to Goddard. Both PIIC and Specht move to dismiss the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARDS

In its complaint, a plaintiff must set out "a legally cognizable right of action" and "enough facts" to make that cause of action "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (internal quotation marks omitted). On a motion to dismiss for failure to state a claim, the Court takes all well-pleaded facts as true and draws all inferences in the light most favorable to the plaintiff. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). "[T]he tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions").

In addition to the complaint, the Court may consider "exhibits attached to the complaint, matters of public record," and "undisputedly authentic documents" that the claims rest upon, *Mayer*, 605 F.3d at 230, plus documents "integral" to a complaint, like a contract, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

## DISCUSSION

This Court exercises diversity jurisdiction over the damages claim under 28 U.S.C. § 1332 and jurisdiction over the declaratory judgment claim under 28 U.S.C. § 2201. As a federal court sitting in diversity, this Court must apply the relevant state's substantive law. *Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007). This particular case is atypical in that this Court has to apply both New Jersey law and Pennsylvania law to the claims against PIIC and Specht, respectively. In other words, this Court must predict what the Pennsylvania Supreme Court and New Jersey Supreme Court would do if presented with Goddard's claims. *Id.* (New Jersey); *see also Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 225 (3d Cir. 2020) (Pennsylvania).

Once the COVID-19 global pandemic hit, Goddard was forced to close its doors. Goddard did not purport to provide childcare services exclusively to essential workers and did not apply for a special certification to remain open. Nevertheless, Goddard continued to incur expenses during this period of closure and seeks to recover these expenses and other lost revenue under its insurance policy with PIIC. The policy, an "all-risks" policy, reimburses for damage and loss from all causes not expressly excluded by the policy. For its purely economic losses, Goddard seeks to recover

under four provisions: the Business Income, Extra Expense, Civil Authority, and Communicable Disease and Water-Borne Pathogen Business Income and Extra Expense provisions. PIIC contends that none of these provisions, by their plain language, cover Goddard's losses.

Anticipating that the policy may not cover its losses, Goddard also sues its insurance broker, Specht, for negligence in securing the policy for it and negligently misrepresenting the coverage that the policy provides.

The Court will address the contract claims against PIIC first under New Jersey law, and then turn to the tort claims against Specht under Pennsylvania law.

## I.    Goddard Has Not Plausibly Pled Any Claim Against PIIC

Goddard claims that four different policy provisions provide coverage: the Business Income, Extra Expense, Civil Authority, and Communicable Disease and Water-Borne Pathogen Business Income and Extra Expense provisions. Goddard also seeks declaratory judgment that the Virus Exclusion provision does *not* apply and seeks to estop PIIC from enforcing it.[1] Lastly, Goddard claims that the denial of coverage in this instance would be contrary to public policy. Because PIIC denied coverage, Goddard alleges that PIIC acted in bad faith.

Both parties agree that New Jersey law governs this contract dispute because the insured property is located in New Jersey. *See* Doc. No. 17-1, at 3 n.2; Doc. No. 23, at 4 n.1. Thus, the Court will apply New Jersey law for the purposes of the claims between Goddard and PIIC.

Under New Jersey law, determining "the proper coverage of an insurance contract is a question of law." *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004). Because an insured "bears the burden of bringing its claim within the basic terms of the insurance policy,"

---

[1] PIIC concedes that the Virus Exclusion does not apply because the Policy does not contain a Virus Exclusion. Doc. No. 17-1, at 21 n.8. Therefore, the Court has no occasion to decide the applicability of this exclusion. However, PIIC contests the applicability of the other contract provisions.

4

Goddard must establish that its claim for coverage unambiguously falls under the Policy. *Arthur Anderson LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1287 (N.J. Sup. Ct. App. Div. 2010).

"Insurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement 'will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled.'" *Mem'l Props., LLC v. Zurich Am. Ins. Co.*, 46 A.3d 525, 532 (N.J. 2012) (quoting *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010)). This principle of contract law remains true "even if a close reading might yield a different outcome, or if a painstaking analysis would have alerted the insured that there would be no coverage." *Flomerfelt*, 997 A.2d at 996 (internal quotation marks omitted). "If the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." *Id.* But, that said, a policy is not ambiguous simply because two parties offer conflicting interpretations. *Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 698 (N.J. Super Ct. App. Div. 2004). Moreover, "courts cannot 'write for the insured a better policy of insurance than the one purchased.'" *Flomerfelt*, 997 A.2d at 996 (quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 214 (N.J. 1989)).

Exclusionary clauses within those contracts are presumptively valid and are enforced so long as they are "specific, plain, clear, prominent, and not contrary to public policy." *Princeton Ins. Co. v. Chunmuang,* 698 A.2d 9, 17 (N.J. 1997) (internal quotation marks omitted). "[I]nsurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion." *Id.* Thus, "exclusions are ordinarily strictly construed against the insurer, and if there is more than one possible interpretation of the language, courts apply the meaning that supports coverage rather than the one that limits it." *Flomerfelt*, 997 A.2d at 997.

5

But again, courts are not to disregard the "clear import and intent" of an exclusion. *Id.* (internal quotation omitted). This means that a court will not read "any far-fetched interpretation of a policy exclusion [to] be sufficient to create an ambiguity requiring coverage." *Stafford v. T.H.E. Ins. Co.*, 706 A.2d 785, 789 (N.J. Super. Ct. App. Div. 1998).

Here, the insurance policy unambiguously provides coverage only in the event of an "outbreak" of a communicable disease at the insured premises, which Goddard does not allege in its Complaint. Moreover, the policy requires *physical* loss of the premises, not merely the loss of certain uses of the property. Thus, the Court finds that the New Jersey Supreme Court would conclude that Goddard cannot recover under its insurance contract with PIIC. The Court will address each of the contested contract provisions in turn, starting with the Communicable Disease provision.

### A. Goddard Has Not Plausibly Pled Any Claim Under the Communicable Disease Provision

Goddard's insurance policy contains an endorsement, the Communicable Disease and Water-Borne Pathogen Business Income and Extra Expense Coverage endorsement ("Communicable Disease provision"). Doc. No. 17-2, Def's Ex. A, at 142. By the terms of that provision, Goddard is covered for:

> We will pay for the actual loss of '**business income**' you sustain and necessary '**extra expense**' you incur during a '**period of restoration**' as a result of having your entire '**operations**' temporarily shut down or suspended. The shutdown or '**suspension**' must be ordered by a local, state or federal Board of Health having jurisdiction over your '**operations.**' Such shutdown must be due directly to an outbreak of a '**communicable disease**' or a '**water-borne pathogen**' that causes an actual illness at the insured premises described in the Declarations. An actual business shutdown must occur.

*Id.* (emphases in original). Furthermore, under the "Causes of Loss" section of this endorsement, the policy clarifies:

> Covered Cause of Loss means an outbreak of a '**communicable disease**,' or a '**water-borne pathogen**' caused by infectious or bacterial organisms. The infectious or bacterial organisms must cause actual illness and result in an order from a local, state or federal Board of Health having jurisdiction over your '**operations**' to temporarily shut down or suspend your entire '**operations**' at the insured premises described in the Declarations.

*Id.* at 143 (emphases in original). For purposes of this specific policy endorsement, "communicable disease" is defined as:

> [A]n illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact or contact with human fluids, waste, or similar agent, such as, but not limited to, Meningitis, Measles, or Legionnaire's Disease.

*Id.* at 143.

Parsing this language, the Court determines that, to be covered, there must be (1) a shutdown or suspension by order of a "local, state, or federal Board of Health" with appropriate jurisdiction, (2) documentation that the "entire 'operations'" were shut down or suspended, (3) a conclusion that the shutdown was "due directly to an outbreak", (4) a determination that the "outbreak" was "of a 'communicable disease' or a 'water-borne pathogen'", (5) a finding that the "outbreak" "cause[d] an actual illness", and (6) evidence that the "actual illness" was "at the insured premises." *Id.* at 142. The "Cause of Loss" provision confirms that there are three elements of causation required: an outbreak caused by "infectious or bacterial organisms," an actual illness caused by that outbreak, and a state or local shutdown order caused by (*i.e.*, in reaction to) those illnesses. *Id.* at 143.

Construing these same provisions, the parties come to different conclusions about the policy's coverage as it applies to the facts of this case. PIIC places great emphasis on the words "due directly" within the coverage clause of this provision. Doc. No. 17-1, at 20 (quoting Doc. No. 17-2, Def's Ex. A, at 142). Based on this language, PIIC argues that Goddard's claim fails for

two separate and independent reasons. First, PIIC contends there was no outbreak at Goddard and, therefore, there could not have been any shutdown "due directly" to a non-existent outbreak. Second, PIIC argues that New Jersey's shutdown of Goddard was not "due directly" to any outbreak specifically "at the insured premises", but, instead, was a general shutdown of almost *all* businesses in the state. On the other side of the scale, Goddard argues that its premises were contaminated and that the shutdown orders *were* specific to it because Governor Murphy's executive order of March 21, 2020, Executive Order 107, specifically included preschools.

The Court begins with the plain language of the coverage clause in the Communicable Disease provision. First, the provision defines "communicable disease" to include "an illness, sickness, condition . . . that is transmissible by an infection or a contagion directly or indirectly through human contact or contact with human fluids." Doc. No. 17-2, Def's Ex. A, at 143. The parties have not tried to create a serious issue on this point, and thus the Court finds that the COVID-19 virus falls within the meaning of this term.[2]

Second, the Communicable Disease provision does not define the term "outbreak." When interpreting undefined terms, courts "resort to the general rule that the terms in an insurance policy should be interpreted in accordance with their plain and commonly-understood meaning." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC*, 143 A.3d 273, 286 (N.J. 2016) (internal quotation marks omitted). An outbreak is "a sudden increase in the incidence of a disease; an epidemic of infectious disease, esp. when relatively localized." *Outbreak* (def. 4), *Oxford English Dictionary* (3d ed. 2004). Goddard agrees with this definition of "outbreak." *See* Doc. No. 23, at 8.

---

[2] "COVID-19 is spread in three main ways: Breathing in air when close to an infected person who is exhaling small droplets and particles that contain the virus. Having these small droplets and particles that contain virus land on the eyes, nose, or mouth, especially through splashes and sprays like a cough or sneeze. Touching eyes, nose, or mouth with hands that have the virus on them." *How COVID-19 Spreads*, Centers for Disease Control and Prevention, (Dec. 27, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

Goddard's Complaint runs into the first roadblock here because it has not alleged the occurrence of any "outbreak." Instead, Goddard alleges only that on March 18, 2020 a "parent who was present at the covered premises, in the presence of students, faculty and other parents, as recently as March 16, 2020. . . had tested positive for Covid-19." Doc. No. 8, Am. Compl. ¶ 9. Goddard claims that, because of this single parent "there was a sudden rise in the incidence of COVID-19 at the premises." Doc. No. 23, at 8. But an increase from 0 to 1 infected person is plainly not an "outbreak" of a communicable disease under the ordinary meaning of the term. While in a highly technical sense an increase from 0 to 1 might be considered "a sudden rise," fairly and realistically understood, an "outbreak" contemplates the infection of more than one person, which Goddard has not alleged.

The Court's approach to the meaning of "outbreak" is confirmed by the New Jersey Department of Health's COVID-19 guidance. Indeed, New Jersey subsequently clarified that an "outbreak" in an educational setting is "[t]wo or more laboratory-confirmed (RT-PCR or antigen) COVID-19 cases among students or staff with onsets within a 14-day period, who are epidemiologically linked, do not share a household, and were not identified as close contacts of each other in another setting during standard case investigation or contact tracing."[3] While Goddard filed its complaint before New Jersey released this guidance, the Court refers to it to underscore the obvious difference between what Goddard has alleged—a single parent testing positive—and an "outbreak," which plainly means more than one infected person.

Based on the plain, ordinary meaning of the word "outbreak" alone, the coverage clause of the Communicable Disease provision does not cover Goddard's claim here. Goddard's policy covers a shutdown due to an "outbreak," not an isolated case as Goddard claims. Indeed, the only

---

[3] N.J. Dep't of Health, *Investigation Guidance for New Jersey Local Health Departments*, 1, 9 (2021), https://www.state.nj.us/health/cd/documents/topics/NCOV/NCOV_chapter.pdf.

reasonable reading of this provision is that it was intended to protect against a localized outbreak, not a global pandemic. Because "its terms are clear" the contract here "will be enforced as written" *Mem'l Props. LLC*, 46 A.3d at 532. While the Court is sympathetic to Goddard's claim, it cannot write a better policy for Goddard. *Flomerfelt*, 997 A.2d at 996. As a result, Goddard's claim under this provision must fail.

The Communicable Disease provision also requires that the "outbreak" "cause[] an actual illness at the insured premises." Doc. No. 17-2, Def's Ex. A, at 142. But again, Goddard has not pled any facts to this effect. Goddard only claims that a parent was "present" at Goddard on March 16, 2020 and that two days later, on March 18, 2020, that same parent "advised" Goddard "she had tested positive for COVID-19." Doc. No. 8, Am. Compl. ¶ 9. Goddard does not claim that any "outbreak" at Goddard "cause[d]" the parent's "actual illness"—*i.e.*, that the parent contracted COVID-19 because of contact with an infected person at the school. Nor does Goddard allege that the parent contracted COVID-19 "at the insured premises." Instead, Goddard argues that, because the parent was on the premises at one point in time, the premises was "contaminated." Doc. No. 23, at 8. But that is clearly not the same. This, in tandem with the Court's conclusion about the lack of an "outbreak," confirms the Court's conclusion that Goddard's claim under this provision fails.

Finally, the Court briefly addresses the "due directly" language within the Communicable Disease provision. PIIC argues that the third causal element identified above, the shutdown order, must be specific to the premises. PIIC contends that Governor Murphy's shutdown orders covered *all* non-essential businesses in the state of New Jersey and thus Goddard's shutdown was not "due directly" to an illness-causing outbreak at Goddard itself. As further support for this argument, PIIC points out that Governor Murphy shut down all businesses, including Goddard, despite the

fact that Goddard never communicated with the New Jersey Department of Health. Goddard responds with two different arguments. First, Goddard contends that the shutdown was specific to it because Governor Murphy's executive order specifically mentioned preschools. Second, Goddard argues that "[i]t is immaterial whether a closure order was issued only to Plaintiff or to schools across the state; the effect was the same—Plaintiff's operations were suspended and the orders were the direct result of an outbreak of a communicable disease." Doc. No. 23, at 9.

As to Goddard's first argument that Governor Murphy's executive order did specifically cover Goddard, the Court is not convinced. The executive order to which Goddard refers, Executive Order 107, named almost every type of business under the sun. *See* Doc. No. 8-7, N.J. Exec. Order 107 (closing, for example, "casino gaming floors," "gyms," "funplexes" and "computer labs," among many others). To say this order is specific to Goddard (or even to the category of similar entities) is to confuse breadth for specificity.

Goddard's second argument fares only slightly better. Goddard is right about the principle of law, but wrong about its application to this case. Although Goddard does not raise this argument, there are situations in which a court will look at the ultimate effect to determine whether an insurance contract provision covers the insured's claim. For example, New Jersey courts use the "efficient proximate cause test," as it is known, "[w]hen there is a conflict as to whether, for coverage purposes, losses should be considered to be 'caused by' an excluded risk or by a covered peril." *N.J. Transit Corp. v. Certain Underwriters at Lloyd's London*, 221 A.3d 1180, 1192 (N.J. Super Ct. App. Div. 2019), *aff'd*, 243 A.3d 1248 (N.J. 2021). Under this test, a court looks to the event that set other events in motion. In other words, "[w]here a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as

the proximate cause of the entire loss. . . ." *Auto Lenders Acceptance Co. v. Gentilini Ford, Inc.*, 854 A.2d 378, 385 (N.J. 2004) (quoting 5 John Alan Appleman, *Insurance Law & Practice,* § 3083, at 309–11 (1970)). Thus, so long as the event setting other events in motion is covered, the insured's loss is covered even if the ultimate effect is one that is specifically excluded under the policy. An illustration of this concept is helpful. Where a policy insures against damage from a storm surge but not flood damage and the property is damaged during a hurricane because a storm surge *caused* subsequent flooding, the storm surge is deemed the proximate cause of the entire loss. *See N.J. Transit Corp.*, 221 A.3d at 1192–93.

Unfortunately for Goddard, that is not the case here. Goddard does not allege multiple causation events. Instead Goddard argues that "[i]t is immaterial whether a closure order was issued only to Plaintiff or to schools across the state" because "the effect was the same." Doc. No. 23, at 9. But that is not alleging *multiple* causation; that is *alternative* causation. In other words, Goddard alleges that there was a causal link between COVID-19 and the shutdown of its business, just not the causal link covered by its insurance contract. And, precisely for that reason, Goddard's claim fails.

Therefore, the Court finds that the New Jersey Supreme Court would likely decide that Goddard cannot recover for its loss under the Communicable Disease provision and grants PIIC's motion to dismiss as to this provision.

### B. Goddard Has Not Plausibly Pled Any Claim Under the Business Income and Extra Expenses Provisions

Goddard also alleges that the Business Income and Extra Expense provisions provide it with coverage under the facts alleged here. PIIC counters that Goddard has not alleged any physical loss to its premises and thus cannot recover. Goddard insists that it did, because it temporarily lost the *use* of its building. But the contract's terms cannot be stretched so far.

The Business Income provision states that PIIC will pay for Goddard's lost income "when your covered building or business personal property listed on the Declarations is damaged by a Covered Cause of Loss." Doc. No. 17-2, Def's Ex. A, at 151. Similarly, the Extra Expense provision states that "'Extra Expense' means necessary expenses you incur during the 'Period of Restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." *Id.* at 152. Both sections refer to a "Covered Cause of Loss," which is defined as, "direct physical loss unless the loss is excluded or limited in this policy." *Id.* at 110.

> i.   *The Policy Requires Physical Loss of the Premises, Not Merely Loss of Certain Uses*

The policy does not define "direct physical loss" or "damage." On its own, "loss" could be read broadly to include "the disadvantage [one] suffer[s] when a valuable and useful thing is taken away," even temporarily. Doc. No. 8, Am. Compl. ¶ 63(b). Yet the policy protects not against "loss" but against "*direct physical* loss." That is, the loss must involve "immediate" harm to something "real" and "tangible." *Direct* (def. 3), *Black's Law Dictionary* (11th ed. 2019); *Physical* (def. 2), in *id.*

The policy pairs "loss of" the property with "damage to" it to make a single phrase, not a series of alternative concepts. Goddard is correct that the two words, separated by "or," must be read to cover separate things. But the terms "loss" and "damage" inform each other. Paired together, "damage to" contemplates "'a distinct, demonstrable, and physical alteration' of its structure," while "loss of" envisions total destruction, such that the "structure is uninhabitable and unusable." *Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235–36 (3d Cir. 2002) (quoting 10 *Couch on Insurance* § 148.46 (3d ed. 1998)); *see also Children's Place,*

13

*Inc. v. Zurich Am. Ins. Co.*, No. 20-cv-7980, 2021 WL 4237284, at *4–5 (D.N.J. Sep. 17, 2021) (construing "direct physical loss of or damage" to require physical damage).

The rest of the Business Income and Extra Expense provisions confirm this analysis. PIIC will reimburse for business income lost while operations are suspended "during the 'period of restoration.'" Doc. No. 17-2, Def's Ex. A at 89. This "period of restoration" is the time for the building to be "repaired, rebuilt or replaced" or, if it cannot be fixed, for Goddard to find a "new permanent location." *Id.* at 96. Temporarily closing the building to the public, as Goddard had to, requires no period of restoration to repair or rebuild. Because "its terms are clear" the contract here "will be enforced as written" *Mem'l Props. LLC*, 46 A.3d at 532.

> ii. *Goddard Has Not Plausibly Pled That its Building Experienced Physical Damage*

Thus, that Goddard lost the *use* of its property for its daycare services is not enough to state a claim under the Business Income and Extra Expense provisions. Goddard must also plausibly plead some sort of physical damage to its premises. Goddard proposes two theories for how its building was damaged, but both miss the mark.

First, Goddard argues that "[s]ocial anxiety over public health and society's change in perception that indoor establishments are unsafe due to COVID-19 creates 'physical loss and damage'" and that "[t]he public's and customers' change in perception is the functional equivalent of damage of a material nature or an alteration in physical composition" "for purposes of commercial property coverage." Doc. No. 8, Am. Compl. ¶¶ 87–89. But the policy reimburses for *actual* "direct physical loss," not *perceived* loss. Similarly, Goddard claims that "[t]he COVID-19 virus and restrictions on the use of Plaintiff's Property are tantamount to a covered cause of loss as it caused direct physical loss and damage to the covered premises." Doc. No. 8, Am. Compl. ¶ 51. But that is just it: something "tantamount to" physical loss is, by definition, not physical loss.

14

Second, Goddard posits that the building was damaged because it was contaminated with COVID-19. In some situations, contamination may make a building uninhabitable, inflicting "a direct physical loss of or damage to that building." *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 12-cv-4418, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014). For example, an ammonia spill might make a business "unfit for occupancy" until the ammonia dissipates. *Id.* Or so much asbestos might be present in the air that no one can safely work in the office building. *Port Authority*, 311 F.3d at 235; *see also Gregory Packaging, Inc.*, 2014 WL 6675934, at *5 (citing same with approval under New Jersey law).

Citing New Jersey law, Goddard appears to argue that the term "damage to" encompasses more under New Jersey law than it does under Pennsylvania law. *See, e.g.*, Doc. No. 23, at 12–16. And while Goddard could well again be right in principle, it is wrong in application.

Goddard is right that certain New Jersey decisions have construed the term "damage" capaciously. The District of New Jersey explained this well in *Gregory Packaging*. There, the court took note of the New Jersey Appellate Division decision in *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724, 727 (N.J. Super. Ct. App. Div. 2009), and explained how the New Jersey court found an electrical grid "had experienced 'physical damage' during a blackout" when "the grid and its component generators and transmission lines were physically incapable of performing their essential function of providing electricity." *Gregory Packaging, Inc.* 2014 WL 6675934, at *5 (quoting *Wakefern Food Corp.*, 968 A.2d at 734). Further, the District of New Jersey found that the Third Circuit Court of Appeals' holding in *Port Authority*, finding asbestos in the air would render a structure "uninhabitable and unusable," "comports with the New Jersey Appellate Division's holding in *Wakefern* that property can be physically damaged, without undergoing structural alteration, when it loses its essential functionality." *Id.* (quoting *Port*

*Authority*, 311 F.3d at 236). With these cases in mind, the District of New Jersey in *Gregory Packaging* concluded that the discharge of ammonia within the packaging facility in that case "inflicted 'direct physical loss of or damage to'" the facility "as that phrase would be construed under New Jersey law." *Id.* at *6.

On the other hand, and as directly relevant to the factual scenario here, the District of New Jersey has also found that the potential presence of COVID-19 within a premises did not constitute "direct physical loss or damage" to property within the meaning of the same policy language at issue in Goddard's contract. In *Marilyn's Kids, Inc. v. Cont'l Cas. Co.*, No. 20-cv-8641, 2021 WL 4488598 (D.N.J. June 30, 2021), the court analyzed a nearly identical claim to the one at issue here. After canvassing case law both in the District of New Jersey and comparing that to the same policy language analyzed under Pennsylvania law by this Court, the *Marilyn's Kids* court concluded that the policy language more plausibly required a showing that the "property was damaged or physically impacted such that the property needed to be repaired, rebuilt, or replaced." *Marilyn's Kids, Inc.*, 2021 WL 4488598, at *5. The District of New Jersey based this conclusion on other similar case law and confirmed it with a construction of a business income provision and the definition of "period of restoration," both of which required some sort of direct physical loss or direct physical damage and repair, replacement, or rebuilding due to the same. *Id.* at *4.

These seemingly disparate conclusions are reconcilable here. First, even applying the rule of *Wakefern* would lead to the same conclusion here. *Wakefern* found that the electrical grid was "physically damaged" because "due to a physical incident or series of incidents, the grid and its component generators and transmission lines were physically incapable of performing their essential function of providing electricity." *Wakefern*, 968 A.2d at 734. And the ammonia vapors in *Gregory Packaging* are precisely the type of "damage" that *would* render a business "physically

incapable of performing their essential function." Here, by contrast, there was no "physical incident or series of incidents" at Goddard nor was Goddard rendered "physically incapable of performing their essential function." Rather, by the terms of its own Complaint, Goddard notes that it and other businesses were shut down "in an effort to protect the public from the global pandemic caused by COVID-19." Doc. No. 8, Am. Compl. ¶ 109. In other words, Goddard does not allege that it was *physically incapable* of performing, but that it was *not permitted* to perform its essential functions as a preventative measure.[4] Second, the conclusion in *Wakefern* was based on different policy language than that at issue here. Third, like the court in *Marilyn's Kids*, this Court, too, thinks that the only reasonable reading of Goddard's policy is that covered damage necessarily entails some physical damage, for otherwise the period of restoration language would be superfluous. *See, e.g.*, Doc. No. 17-2, Def's Ex. A at 96 ("'Period of Restoration'. . . Ends on the earlier of the date when the property. . . should be repaired, rebuilt or replaced. . . or the date when business is resumed at a new permanent location.").

Because "its terms are clear" the contract here "will be enforced as written." *Mem'l Props. LLC*, 46 A.3d at 532. Goddard has not plausibly pled physical damage to or loss of its property. Thus, it cannot recover for economic loss under the Business Income and Extra Expense provisions and the Court grants PIIC's motion to dismiss Goddard's claims under these provisions as well.

C. Goddard Has Not Plausibly Pled Any Claim under the Civil Authority Provision

Goddard also points to another part of the policy, the Civil Authority provision, which compensates for "the actual loss of Business Income. . . and necessary Extra Expenses" when a "civil authority … prohibits access" to Goddard's building. Doc. No. 17-2, Def's Ex. A at 99, 152.

---

[4] The Court also notes that childcare services, like Goddard's, were not all closed immediately and indefinitely. By Goddard's own complaint, facilities providing childcare for essential workers were allowed to remain open, provided they were certified; this was an option Goddard declined to pursue. Doc. No. 8, Am. Compl. ¶ 13.

Goddard's policy clarifies that, in order for this provision to apply, two necessary conditions must be met. First, "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and" Goddard's property is "within that area but [] not more than one mile from the damaged property." *Id.* at 99. Second, "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property." *Id.* In other words, Goddard must allege that it met *both* conditions in order to be covered under the Civil Authority provision.

Working through this provision, it is true, as Goddard claims, that New Jersey's stay-at-home orders came from civil authorities. But Goddard has not pled that any nearby property experienced damage from a "Covered Cause of Loss," which is defined as, "direct physical loss." *Id.* at 110. Instead, Goddard claims only that some unidentified number of its neighbors experienced physical damage because the virus is "everywhere" and having the "virus on surfaces renders the property damaged." Doc. No. 23, at 21. But, as explained above, the virus did not cause any physical loss or damage to any buildings. Thus, Goddard has not pled any facts that would meet the second necessary condition described above, which means that Goddard cannot fall within the coverage of the Civil Authority provision.

Moreover, Goddard has not plausibly pled that the orders shut down Goddard's business "as a result of" damage to nearby buildings rather than "fears of future" infections among the population. Doc. No. 17-2, Def's Ex. A at 99; *United Air Lines, Inc. v. Ins. Co. of State of Pa.*, 439 F.3d 128, 134–35 (2d Cir. 2006); *cf. Brothers, Inc. v. Liberty Mut. Fire Ins. Co.*, 268 A.2d 611, 613–14 (D.C. 1970) (no coverage for business income lost due to curfew and regulations imposed in response to riots when property experienced "no physical damage" from riots). In fact, the orders

show the opposite, explaining that they were put in place to "slow the spread of COVID-19" due to contact between people, not because the buildings themselves posed a danger to the public. Doc. No. 8-7, at 4. In other words, Goddard also has not pled any fact that would meet the first necessary condition either.

Because "its terms are clear" the contract here "will be enforced as written." *Mem'l Props. LLC*, 46 A.3d at 532. Goddard cannot seek recovery for its lost income under the Civil Authority Provision and the Court also grants PIIC's motion to dismiss Goddard's claim under this provision.

### D. Goddard Has Not Plausibly Pled That its Reasonable Expectations Should Overcome the Policy's Plain Language

Though it loses on the policy's plain language, Goddard objects that it reasonably *expected* its insurance to cover the losses it experienced during the pandemic. New Jersey contract law recognizes that insurance policies are typically contracts of adhesion. *Doto v. Russo*, 659 A.2d 1371, 1376 (N.J. 1995). As such, New Jersey courts "must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992). Thus, courts interpret policies "to accord with the objectively reasonable expectations of the insured." *Doto*, 659 A.2d at 1376–77. That means courts "recognize[] the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing and in exceptional circumstances, when the literal meaning of the policy is plain." *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 934 (N.J. 2005).

As Goddard aptly notes, there are occasions in which New Jersey courts have decided in favor of an insured based on this legal principle. For example, in *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406 (N.J. 1985), the New Jersey Supreme Court explained the provenance of this theory and its application in various cases over time. However, in another case to which Goddard also directs

the Court's attention, the Third Circuit Court of Appeals clarified that "under New Jersey law, the 'exceptional circumstances' that might allow a court to construe a clear and unambiguous policy exclusion in accordance with the objectively reasonable expectations of the insured, rather than in accordance with the plain language of the exclusion, arise only when a literal application of the exclusion would also violate public policy." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006). Moreover, the Third Circuit Court of Appeals, citing *Sparks*, noted that this legal principle "has rarely been applied by the New Jersey Supreme Court." *Id.* at 236.

Here, Goddard's claim and the Court's resolution of it do not involve any exclusions under Goddard's policy. Instead, the Court need only to construe the plain language of the policy to determine that Goddard's claim does not fall within any of the coverage that PIIC's policy provides. Moreover, Goddard does not allege *why* finding that the clear and unambiguous language of the policy precludes its claim would violate public policy. Instead, Goddard states only that "denial is contrary to public policy" and that "[a] declaratory judgment that the Policy provides coverage will also further the public policy of the State." Doc. No. 8, Am. Compl. ¶¶ 126, 128, 133. Such conclusory legal assertions are not sufficient to overcome a motion to dismiss. *Morse*, 132 F.3d at 906. While the Court understands Goddard's exasperation and frustrations in light of the catastrophic effects the COVID-19 pandemic has had on people, families, and innumerable businesses nationwide, the Court cannot alter the clear and unambiguous language of Goddard's policy so as to provide coverage because of that.

Therefore, the Court dismisses Count II of Goddard's Complaint for breach of contract but without prejudice, in case it can provide "enough fact[s]" to make out a plausible claim that PIIC's denial here contravened its reasonable expectations as New Jersey law would allow.

E.  The Court Dismisses Goddard's Claims for Declaratory Judgment and Bad Faith for the Same Reasons

Because the Court dismisses Goddard's claim for breach of contract in Count II, it also dismisses Counts I and III, Goddard's claims for declaratory relief and bad faith.

Goddard's claim for declaratory relief is duplicative of its claim for breach of contract. Because the Court finds that Goddard's claims do not fall within the coverage of its insurance contract with PIIC and thus PIIC did not breach the contract, the Court similarly finds that Goddard is not entitled to declaratory relief. *Butta v. Geico Cas. Co.* 400 F. Supp. 3d 225, 233 (E.D. Pa. 2019) ("Courts generally decline granting declaratory relief when the claim for declaratory judgment is entirely duplicative of another claim in the cause of action."); *see also LM Gen. Ins. Co. v. Lebrun*, 470 F. Supp. 3d 440, 456 (E.D. Pa. 2020) ("Courts routinely dismiss declaratory judgment claims when they are duplicative of breach of contract claims.") (collecting cases). Therefore, the Court also dismisses Count I, Goddard's claim for declaratory relief.

Goddard's claim for bad faith fails, too, but for different reasons. "[A]n insurance company owes a duty of good faith to its insured in processing a first-party claim." *Pickett v. Lloyd's*, 621 A.2d 445, 450 (N.J. 1993). To establish an insurer's bad faith, the insured must demonstrate that coverage was so clear that it was not "fairly debatable." *Id.* at 454. Put differently, "a plaintiff must show the lack of a reasonable basis for denying the claim or unreasonably delaying its processing, and the insurer's knowledge or reckless disregard that it was acting unreasonably." *Wacker-Ciocco v. Gov't Emp. Ins. Co.*, 110 A.3d 962, 968 (N.J. Sup. Ct. App. Div. 2015). Finally, and important to Goddard's claim here, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim." *Pickett*, 621 A.2d at 454.

According to Goddard, the fact that PIIC initially offered to reimburse it for the costs associated with decontaminating the school and simultaneously declined to pay for business income and extra expenses demonstrates PIIC's bad faith. In its letter detailing why it was denying Goddard's claim, PIIC clarified that it "did agree to reimburse you for your reasonable costs for cleaning the School, subject to a full reservation of rights." Doc. No. 8-4, Pl's Ex. 4. As the Court has already established, Goddard's claim does not fall within the coverage provided by its contract with PIIC. Thus Goddard would not be able to establish as a matter of law its right to summary judgment on the substantive claim, at least on the facts as pled in its complaint. *Pickett*, 621 A.2d at 454. In other words, that PIIC volunteered to a certain limited initial payment is not evidence that its subsequent denial of Goddard's full claim was done in bad faith. Therefore, the Court also grants PIIC's motion to dismiss Goddard's complaint for bad faith in Count III of its complaint.

Having resolved all of Goddard's claims as to PIIC, the Court grants PIIC's motion to dismiss in full.

## II.   Goddard has not Plausibly Pled A Claim for Negligence Against Its Broker, Specht

Goddard also filed claims against its insurance broker, Specht. In Counts IV and V of its amended complaint, Goddard alleges counts of negligence and negligent misrepresentation against Specht. Both parties agree that Pennsylvania law governs Goddard's claims against Specht.[5] *See* Doc. No. 40-1, at 10; Doc. No 42, at 5. Specht moves to dismiss both counts. The Court will address each in turn.

---

[5] Because the parties agree that Pennsylvania law applies, the Court will not engage in a choice of law analysis.

### A. Goddard Has Not Plausibly Pled that Specht Breached Its Duty

Under Pennsylvania law, a plaintiff claiming negligence must allege the following: (1) a duty owed to the plaintiff by the defendant, (2) the defendant's breach of that duty, (3) a causal relationship between the defendant's breach and the plaintiff's injury, and (4) an actual loss by the plaintiff. *J.E.J. v. Tri-Cnty. Big Brothers/Big Sisters, Inc.*, 692 A.2d 582, 584 (Pa. Super. Ct. 1997). All four elements are necessary, such that if the plaintiff's allegations as to any single element are insufficient, the plaintiff has failed to meet his burden to establish a prima facie case.

Goddard claims that Specht breached its duty. Specifically, Goddard claims that it "requested and Defendant Specht undertook to secure coverage as broad as possible." Doc. No. 8, Am Compl. ¶ 172. Goddard argues that it "specifically asked" Specht "if business income loss would be covered" if Goddard school "was shut down for any reason" and claims that the broker answered "Absolutely." *Id.* ¶ 34. Based on that alleged representation, Goddard claims it foreseeably and reasonably relied on Specht's statement to Goddard's detriment and, when it was forced to close due to the COVID-19 pandemic, it expected PIIC to provide coverage. Moreover, Goddard claims that Specht did not "adequately communicate[]" the scope of the four provisions under which Goddard makes claims here. *Id.* ¶ 174. In short, Goddard alleges that Specht acted negligently by failing to obtain coverage "that would cover losses due to a public health emergency arising from a virus such as COVID-19." *Id.* ¶ 176(c).

Specht counters each of Goddard's arguments. First, Specht argues that it did not owe Goddard the type of duty Goddard alleges because it was not acting as Goddard's agent or fiduciary. Second, Specht argues that not only had it fulfilled (*i.e.*, did not breach) its duty by procuring the policy which Goddard presently disputes, it could not have procured a policy protecting against a public health emergency like COVID-19 because no such policy was available

on the market at the time. Third, Specht argues that it had no ongoing duty to inform and update Goddard as to the nature of its coverage under the PIIC policy. The Court agrees.

First, the Court agrees that Goddard has not alleged Specht provided deficient service under the applicable standard of care. Although brokers owe their clients a duty of good faith and fair dealing, *Londo v. McLaughlin*, 587 A.2d 744, 747 (Pa. Super. 1991), they have no obligation to "advise the insured as to the type or amount of available coverage, or to obtain total/full coverage, or explain the policy and its coverages and/or exclusions, absent a special relationship." *Stern Family Real Estate P'ship v. Pharmacists Mut. Ins. Co.*, No. 06-cv-130, 2007 WL 951603, at *3 (W.D. Pa. Mar. 27, 2007) (applying Pennsylvania law). While the definition of a "special relationship" is not entirely clear, it can be established "when [an] insurance agent 'holds himself or herself out as an insurance specialist, consultant, or counselor and is receiving compensation for consultation and advice apart from premiums paid by the insured.'" *Id.* at *4 n.10 (quoting Couch on Insurance 3d, § 46:39 at 46–52 & n.49).

Goddard has not alleged the existence of a special relationship here. To be sure, Goddard alleges that "Specht held itself out as experienced insurance brokers with expertise in evaluating, recommending and binding appropriate insurance coverage for commercial business clients." Doc. No. 8, Am. Compl. ¶ 29. But Goddard does not allege that it was paying Specht for consultation and advice apart from commissions Specht may have earned (from the insurer) calculated on any premiums Goddard paid. As Specht points out, it had no contract with Goddard to procure insurance as Goddard's agent, and Specht was free to engage co-brokers in its quest to find an insurance policy. Indeed, Goddard could have dispatched other brokers as well to scour the marketplace looking for insurance. Thus, there can be no finding of a special relationship here based on Goddard's pleadings.

Second, the Court agrees that Goddard has not alleged that Specht breached its duty of care because it did not procure an insurance contract broad enough to cover an unforeseeable event. In Pennsylvania, the applicable standard of care is "the skill and knowledge normally possessed by members of that profession. *Pressley v. Travelers Prop. Cas. Corp.*, 817 A.2d 1131, 1138 (Pa. Super. Ct. 2003) (citing The Restatement (Second) of Torts, § 299A (1965)). In other words, it is a broker's duty "to exercise the skill and knowledge normally possessed by members of that profession to make sure that the coverage sought by the insured is the coverage received." *Sherman v. John Brown Ins. Agency Inc.*, 38 F. Supp. 3d 658, 664 (W.D. Pa. 2014).

Goddard claims that Specht breached its duty in this case because it "specifically asked" Specht "if business income loss would be covered" if Goddard school "was shut down for any reason" and alleges that Specht answered "Absolutely." Doc. No. 8, Am. Compl. ¶ 34. Further, Goddard claims that it had a "reasonable expectation" that its policy coverage "would apply in the event that a civil authority issued an order effectively closing Plaintiff's business because of a public health emergency, such as the COVID-19 pandemic." *Id.* ¶ 173. But this cannot be a breach of Specht's duty. Goddard cannot plausibly claim that it reasonably relied on Specht's assurance that the insurance policy here would cover Goddard if it "was shut down for any reason." *Id.* ¶ 34. For one, if the policy were that simple and all-encompassing, it would not need to be over 300 pages. And, if Goddard planned to purchase such a simple policy, it would not have needed a broker. Finally, Goddard makes no allegation that Specht failed to exercise the skill and knowledge normally possessed by insurance brokers. Indeed, it would be tough to claim that Specht did not match up to others in the profession when no reasonable insurance broker could have predicted the COVID-19 pandemic before it occurred and worked to acquire policy coverage for it in advance. While no doubt there are many brokers who hold themselves out as being ready, willing,

and able to go above and beyond for their clients, Specht has not breached its duty by failing to go beyond the realm of prescient heroics in the absence of an engagement to do so.

Third, the Court agrees that Goddard has not alleged Specht breached its duty of care by failing to communicate the breadth and scope of the policy. As Specht points out, neither insurers nor brokers are obligated to explain clearly worded and unambiguous policy language to the insured. *Hess v. Allstate Ins. Co.*, 614 F. Supp. 481 (W.D. Pa. 1985), *aff'd*, 804 F.2d 1248 (3d Cir. 1986); *Kilmore v. Erie Ins. Co.*, 595 A.2d 623, 626 (Pa. Super. Ct. 1991) ("The basic contractual nature of insurance coverage. . . requires fair dealing and good faith on the part of the insurer, not hand holding and substituted judgment."). Thus, that Specht did not walk Goddard through the meaning and implication of each and every provision is not an allegation for a breach of duty.

Because Goddard has not alleged that Specht breached any duty owed to Goddard, Goddard has not plausibly alleged a prima facie case for negligence. As such, Goddard's claim for negligence cannot survive Specht's motion and the Court grants Specht's motion as to Count IV.

### B. Goddard Has Not Plausibly Pled that Specht Negligently Misrepresented Information

In the alternative to its claim for general negligence, Goddard also alleges that Specht negligently misrepresented the PIIC policy's coverage. Goddard claims that Specht "negligently supplied incorrect and incomplete information to Plaintiff" and did so "for its own pecuniary interest." Doc. No. 8, Am. Compl. ¶ 180. Goddard claims it relied on Specht's assurances and representations, which, when PIIC denied coverage, turned out to be false.

Specht counters that Goddard got the exact policy it wanted and that no better policy was available on the market. Moreover, Specht claims that the type of damages Goddard claims for this alleged breach are not available in negligent misrepresentation cases.[6]

Under Pennsylvania law, a claim for negligent misrepresentation has four elements: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation." *Gregg v. Ameriprise Fin., Inc.* 245 A.3d 637, 646 (Pa. 2021). Unlike intentional misrepresentation, a negligent "misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (citing Restatement (Second) of Torts § 552)).

First, Goddard's claim that Specht misrepresented the coverage is a stretch. Even assuming that the Specht broker did say that Goddard's policy would "absolutely" cover lost business income "if the covered property. . . was shut down for any reason," as the Court must at this stage, this does not amount to a misrepresentation. Rather, this is "an exaggeration or overstatement expressed in broad, vague, and commendatory language" otherwise known as "common marketplace puffery." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). Indeed, no reasonable party would believe that an insurance policy would cover it unconditionally.

---

[6] The case Specht cites for this proposition does not say what Specht asserts. While Specht claims that the entire negligent misrepresentation claim against it must fail because Goddard could not recover damages against Specht related to Goddard's contract with PIIC, the case says the exact opposite. Considering whether Pennsylvania would adopt § 552B of the Restatement (Second) of Torts, the Third Circuit Court of Appeals stated that "while § 552B prohibits a plaintiff from recovering the benefit of its bargain with the defendant in a negligent misrepresentation case, it allows such a plaintiff to recover the lost benefit of a contract formed with an entity other than the defendant." *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A.*, 801 F.3d 347, 356 (3d Cir. 2015). In other words, it seems that Goddard *could* allege damages for the lost benefits of its contract formed with PIIC as against Specht.

Moreover, this is not at all like other negligent misrepresentation. For example, it is not like the case where a broker tells an insured party that their policy contains a provision for life insurance in addition to mortgage protection when, in fact, it did not. *See Rempel v. Nationwide Life Ins. Co.*, 323 A.2d 193, 194–195 (Pa. Super. Ct. 1974). Nor is it like the case where an insurance agent procures a policy from a financially infirm insurance carrier not licensed to do business in the state. *See Al's Café, Inc. v. Sanders Ins. Agency*, 820 A.2d 745, 747 (Pa. Super. Ct. 2003). Nor still is it like the case of a broker telling an insured couple he was depositing money into a life insurance policy when he was actually doing something else with the money. *See Gregg*, 245 A.3d at 642. Rather, Goddard's claim is that Specht acquired precisely the policy Goddard wanted, only it did not cover Goddard for every possible loss including the loss Goddard sustained from the unforeseeable COVID-19 pandemic. That is not misrepresentation.[7]

And, while the Court must accept all of Goddard's pled facts as true at the motion to dismiss stage, the Court does not consider legal conclusions nor conclusory allegations. Beyond its claim that Specht allegedly assured Goddard its policy would "absolutely" cover everything, Goddard has provided no basis upon which Specht can be liable for negligent misrepresentation here. Instead, it only walks through the elements of a negligent misrepresentation claim. But simply reciting the elements of a cause of action is not sufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Morse*, 132 F.3d at 906.

---

[7] For similar reasons the Court doubts that a Pennsylvania court would find any factual allegations that would prove Goddard justifiably relied on Specht's alleged statements. It is true that insured parties are not required to have read the policy nor to have understood the policy language and often justifiably rely upon an insurance broker who is knowledgeable in the field. *See Rempel*, 370 A.2d at 369–70. Still, the recipient's reliance on the information must be *justifiable*. No reasonable party, sophisticated or unsophisticated in matters of insurance, could *justifiably* believe that the policy would cover losses "if the covered property. . . was shut down for any reason" as Goddard claims. Doc. No. 8, Am. Compl. ¶ 34. No commercial comprehensive general coverage insurance policy provides the type of blanket coverage that Goddard wishes in the absence of separately and specifically negotiable (and paid for) coverages.

Therefore, the Court dismisses Goddard's claim for negligent misrepresentation in Count V without prejudice. Goddard may replead this claim if it can return with more facts and clearer legal theories.

## CONCLUSION

"[T]he insured gets what protection he pays for." *Cleland Simpson Co. v. Firemen's Ins. Co. of Newark, N.J.*, 140 A.2d 41, 44 (Pa. 1958). By its terms, Goddard's policy with PIIC covers loss due to an outbreak of a communicable disease, which Goddard has not alleged, and reimburses Goddard for property damage, not pure economic loss. Because Goddard has not plausibly alleged the existence of an outbreak nor any property damage, the Court grants PIIC's motion to dismiss. Moreover, Goddard has not plausibly alleged a claim for negligence or negligent misrepresentation against Specht. Goddard has pled that Specht acquired precisely the insurance policy that Goddard wanted, only that it did not cover the entirely unforeseeable loss occasioned by the COVID-19 global pandemic. That is neither negligence nor misrepresentation. Therefore, the Court grants both motions to dismiss without prejudice. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE